1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

BREANNE L. F.,

                    Plaintiff,

          v.

COMMISSIONER OF SOCIAL
SECURITY,

                    Defendant.

Case No. C23-5869 SKV

ORDER REVERSING THE
COMMISSIONER'S DECISION

Plaintiff seeks review of the denial of her applications for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB).  Having considered the ALJ's decision, the administrative record (AR), and all memoranda of record, the Court **REVERSES** the Commissioner's final decision and **REMANDS** the matter for further administrative proceedings under sentence four of 42 U.S.C. § 405(g).

**BACKGROUND**

Plaintiff was born in 1979, has a bachelor's degree in psychology, and took some courses toward a master's degree in business but did not complete the degree.  AR 553-54, 523.  Plaintiff has worked as a counselor/program aide at a youth group home and as a

paratransit agent/transportation clerk.  AR 522, 557-58, 556-67.  Plaintiff was last gainfully employed prior to her December 31, 2017 alleged onset date.  AR 502.

On April 8, 2019, and November 22, 2019, Plaintiff applied for DIB and SSI benefits, respectively.  AR 499, 789-92, 797-814.  Plaintiff alleged a December 31, 2017 onset date in both applications.[1]  AR 789-92, 797-814.  Plaintiff's applications were denied initially and on reconsideration, and Plaintiff requested a hearing.  AR 581-95, 596-630, 644-45. After the ALJ conducted hearings on June 3, 2022, and November 1, 2022, the ALJ issued a decision on December 12, 2022, finding Plaintiff not disabled.[2]  AR 535-43, 544-80, 499-525.

## THE ALJ'S DECISION

Utilizing the five-step disability evaluation process,[3] the ALJ found:

**Step one**:  Plaintiff has not engaged in substantial gainful activity since December 31, 2017.

**Step two**:  Plaintiff has the following severe impairments:  degenerative disc disease of the cervical, thoracic, and lumbar spine, right hip osteoarthritis and fracture of the right femoral neck, status post total right hip arthroplasty, degenerative joint disease of the left hip and left knee, recurrent duodenal ulcers with GI bleed, peptic ulcer disease, and iron deficiency anemia.

**Step three**:  These impairments do not meet or equal the requirements of a listed impairment.[4]

---

[1] The relevant period for purposes of Plaintiff's DIB claim was December 31, 2017, through the December 12, 2022, the date of the ALJ's decision.  (Plaintiff's date last insured ("DLI") for purposes of her DIB claim, March 31, 2023, post-dated the ALJ's decision. *See* AR 501.)  By contrast, the relevant period for Plaintiff's SSI claim was May 2019 through the ALJ's December 12, 2022 decision.  *See* 20 C.F.R. § 416.335 (SSI benefits are not retroactive to the date of disability onset, but are payable one month following the month in which the application was filed, which, in this case, would have been May 2019).

[2] The ALJ continued the June 2022 hearing so that Plaintiff could obtain counsel and complete the record.  AR 542-43.

[3] 20 C.F.R. §§ 404.1520, 416.920.

[4] 20 C.F.R. Part 404, Subpart P., App. 1.

**Residual Functional Capacity**:  Plaintiff can perform light work with additional postural and environmental limitations.

**Step four**:  Plaintiff can perform past relevant work; therefore, Plaintiff is not disabled.

**Step five**:  Additionally, pursuant to the testimony of a VE, there are additional jobs that exist in significant numbers in the national economy that Plaintiff can perform, including merchandise marker, cashier II, and office helper.

AR 499-524.

The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the Commissioner's final decision.[5]  AR 1-7.  Plaintiff appealed the final decision of the Commissioner to this Court.  Dkt. 4.  The parties consented to proceed before the undersigned Magistrate Judge.  Dkt. 2.

## LEGAL STANDARDS

Under 42 U.S.C. § 405(g), this Court may set aside the Commissioner's denial of social security benefits when the ALJ's findings are based on harmful legal error or not supported by substantial evidence in the record as a whole.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 (9th Cir. 2005).  As a general principle, an ALJ's error may be deemed harmless

---

[5] Plaintiff submitted 481 pages of new evidence to the Appeals Council.  AR 2, 8-488.  The Appeals Council ruled that 114 pages dated April 29, 2022, to May 31, 2022, duplicated evidence already in the record, and the Appeals Council declined to exhibit those duplicative 114 pages.  AR 2; *see also* AR 6992-7258 (existing records); *cf.* AR 8-346 (various duplicate records from April 29, 2022, to May 31, 2022, in addition to new medical records from June 1, 2022, through April 11, 2023).  As for the remaining 367 pages of non-duplicative records, the Appeals Council ruled that the additional new evidence dated June 1, 2022, through June 7, 2023, "does not relate to the period at issue," and "[t]herefore, [did] not affect the decision about whether [Plaintiff] was disabled beginning on or before December 12, 2022."  AR 2; *see also* AR 8-488 (new evidence submitted by Plaintiff).  The Court notes that it has, as required, considered the 367 pages of non-duplicative new evidence in conjunction with Plaintiff's instant appeal.  *See Brewes v. Commissioner of Soc. Sec. Admin.*, 682 F.3d 1157, 1162-63 (9th Cir. 2012) (when the Appeals Council "considers" the new evidence "in denying review of the ALJ's decision, [it becomes] part of the administrative record, which the district court must consider in determining whether the Commissioner's decision is supported by substantial evidence"); *see also Williams v. Berryhill*, No. 17-5885-BAT, 2018 WL 6737511, at *3 (W.D. Wash. Apr. 19, 2018) (the court considers new evidence that the Appeals Council itself considered but failed to exhibit).

1   where it is "inconsequential to the ultimate nondisability determination."  *Molina v. Astrue*,

2   674 F.3d 1104, 1115 (9th Cir. 2012) *superseded on other grounds by* 20 C.F.R. § 416.920(a)

3   (cited sources omitted).  The Court looks to "the record as a whole to determine whether the

4   error alters the outcome of the case."  *Id.*

5          Substantial evidence is "more than a mere scintilla.  It means - and means only - such

6   relevant evidence as a reasonable mind might accept as adequate to support a conclusion."

7   *Biestek v. Berryhill*, 587 U.S. 97, 102-03 (2019) (citations omitted); *Magallanes v. Bowen*,

8   881 F.2d 747, 750 (9th Cir. 1989).  The ALJ is responsible for evaluating symptom testimony,

9   resolving conflicts in medical testimony, and resolving any other ambiguities that might exist.

10   *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  While the Court is required to

11   examine the record as a whole, it may neither reweigh the evidence nor substitute its judgment

12   for that of the Commissioner.  *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  When

13   the evidence is susceptible to more than one rational interpretation, it is the Commissioner's

14   conclusion that must be upheld.  *Id.*

### DISCUSSION

16          Plaintiff argues the ALJ erred in her step three listings analysis, in rejecting Dr.

17   Crampton's medical opinion regarding Plaintiff's mental impairments, and in evaluating

18   Plaintiff's testimony.  Dkt. 14 at 1.  The Commissioner argues the ALJ's decision is free of

19   harmful legal error, supported by substantial evidence, and should be affirmed.

20          **A.      The ALJ Erred at Step Three.**

21          Plaintiff argues that the ALJ erred at step three when she failed to adequately consider

22   whether Plaintiff's gastrointestinal impairments medically equaled the relevant listing(s).

23

Beginning in April 2020, during both the relevant DIB and SSI periods, Plaintiff received multiple blood transfusions.  The April 2020 transfusions were required after Plaintiff suffered from an upper GI bleed and was hospitalized from April 8-12, 2020.  AR 1927, 1906.  There is no dispute that during the April 2020 hospitalization, Plaintiff received a one unit blood transfusion.  AR 1927; *accord* AR 509, 977, 551; *see also* Dkt. 14 at 5.

Subsequently, Plaintiff was again hospitalized from May 20-22, 2020, with a "deep prepyloric ulcer."  AR 1906.  There is also no dispute that during the course of that hospitalization, Plaintiff received a blood transfusion of two units.  AR 509, 977; *see also* Dkt. 14 at 5.

Thereafter, from October 19-21, 2020, Plaintiff was hospitalized a third time that year for two non-bleeding gastric ulcers and hypokalemia following a hernia surgery.  AR 1871.  Plaintiff received a blood transfusion during that hospitalization, but the number of units is unknown because the pertinent hospital records are missing from the record, and the transfusion is documented only in primary care physician ("PCP"), Dr. Dawson's November 10, 2020 visit records.  AR 1871.

Plaintiff's fourth and final transfusion(s) during 2020 occurred while she was hospitalized from November 2-5, 2020.  AR 1871.   Plaintiff received a blood transfusion during that hospitalization, but, again, like Plaintiff's October 2020 hospitalization, the number of units is unknown because the pertinent hospital records are missing from the record, and the transfusion is documented only in PCP, Dr. Dawson's November 10, 2020 visit records.  AR 1871.

Plaintiff thereafter received multiple additional transfusions in 2022, while she was hospitalized for eight weeks from February 4-April 2, 2022, for perforated peptic ulcer disease

1  after complications related to a failed surgery that included an exploratory laparotomy and

2  repair of a perforated recurrent duodenal ulcer.  *See* AR 2027-6797, 7000-156 (Plaintiff's

3  hospitalization records for that time period).  During that eight-week hospitalization, Plaintiff

4  received at least six units of blood during six transfusions, dated February 8, 11, 12, 19, and

5  26, and March 19, 2022.[6]  AR 2306 (one unit on February 8, 2022); AR 2333 (one unit on

6  February 11, 2022); AR 2344 (one unit on February 12, 2022); AR 2403 (one unit on

7  February 19, 2022); AR 1766, 2442 (at least one unit on February 26, 2022);[7] AR 2596 (at

8  least one unit on March 19, 2022).[8]

9        As Plaintiff notes, prior to her November 1, 2022 hearing, she submitted a prehearing

10  brief in which she acknowledged that her multiple blood transfusions "did not neatly fit" the

11  pertinent listing, Listing 5.02.  AR 977.  The version of Listing 5.02, gastrointestinal

12

13  [6] Plaintiff's prehearing brief stated there was an additional unit transfused on March 20, 2022.  AR 978
    (citing AR 2597).  No such transfusion appears in the cited record, and Plaintiff has not included a

14  March 20, 2022 transfusion within the list of 2022 transfusions contained in her brief before this
    Court.  Dkt. 14 at 6.

15  [7] In her prehearing brief, Plaintiff asserted that she received one unit of blood on February 26, 2022.

16  AR 978 (citing AR 2442) (hospital record notes "[one] unit PRBC").  In the December 2022 decision,
    the ALJ found that Plaintiff had a transfusion on February 26, 2022, but the ALJ did not make a
    finding regarding the quantity.  AR 509 (citing AR 1766 (Dr. Dawson's April 2022 notes)).  Plaintiff

17  now states in her opening brief before this Court that she actually received two units on February 26,
    2022, based on billing codes that suggest "multiple blood products were administered."  Dkt. 14 at 6

18  (citing AR 2078, 2149, 2422, 4323, 4334).  The Court is unable to ascertain the precise number of
    units based on Plaintiff's cited evidence.  Plaintiff, in essence, asks the Court to play medical expert

19  and interpret medical charts and raw medical data in the exhibits she cites, which the Court declines to
    do.  *See* AR 2078 (medical chart); AR 2149 (hospital records stating that on February 26, 2022,

20  Plaintiff "received a blood transfusion for a slow drift in her hematocrit").  Given the Court's findings
    that remand is required for other reasons, this argument is more appropriately directed to the ALJ, who

21  should on remand reconsider and make findings regarding the quantity of blood transfused on
    February 26, 2022.

22  [8] Plaintiff makes the same argument regarding the transfusion(s) on March 19, 2022 as she does above
    regarding the February 26, 2022 transfusions.  *See* Dkt. 14 at 6.  The ALJ did not address the March

23  19, 2022 transfusion at all in her December 2022 decision.  AR 509.  As with the February 26, 2022
    transfusion, this a factual issue more appropriately resolved by the ALJ on remand.

hemorrhaging, in effect at the time of Plaintiff's application and the November 2022 hearing, provided in pertinent part: [9]

> Gastrointestinal hemorrhaging from any cause, requiring blood transfusion (with or without hospitalization) of at least 2 units of blood per transfusion, and occurring at least three times during a consecutive 6–month period. The transfusions must be at least 30 days apart within the 6–month period. Consider under a disability for 1 year following the last documented transfusion; thereafter, evaluate the residual impairment(s).

20 C.F.R. § Pt. 404, Subpt. P, App. 1.

In her prehearing brief, Plaintiff acknowledged that her transfusions did not satisfy the listing's thirty-day requirement, but argued that her multiple transfusions nevertheless "equal[led] the severity of the listing." AR 977. Plaintiff then detailed her multiple blood transfusions during the period from April 2020-May 2022, and further "reserve[d] the right" to offer additional listing arguments at the November 2022 hearing. AR 978.

---

[9] Although Plaintiff argued the correct version of the listing at the November 2022 hearing, she set forth an erroneous version of Listing 5.02 in her briefing before this Court, relying on a version that did not take effect until October 2023. Dkt. 14 at 4; Dkt. 21 at 3. The Commissioner, in opposition, makes the same mistake. *See* Dkt. 20 at 3-4. The erroneous version relied on by the parties before this Court states that Listing 5.02 is met where there was:

> [g]astrointestinal hemorrhaging from any cause, requiring three blood transfusions of at least 2 units of blood per transfusion, *within a consecutive 12–month period* and at least 30 days apart.

20 C.F.R. § Pt. 404, Subpt. P, App. 1 (emphasis added). The significant disparity between the argued listing and the applicable listing concerns the length of the controlling time period – six months versus twelve months. The Court notes, though, that the ALJ below applied the correct May 22, 2018-September 23, 2019 version of Listing 5.02 in effect at the time that Plaintiff filed her application (as stated above in text). *See* AR 508-09; *see also, e.g., Ken M. o/b/o Berry M. v. Berryhill*, 340 F. Supp. 3d 1070, 1077 (W.D. Wash. 2018) (listing cases, and noting that "[c]ourts in this district have, on more than one occasion, construed Ninth Circuit law as requiring an ALJ to apply the listings in effect at the time of a claimant's application") (citations omitted). That effective version of Listing 5.02 employed a six-month period as opposed to the twelve-month period specified by the current version of Listing 5.02.

1    Subsequently, at the November 2022 hearing, Plaintiff again acknowledged that while

2    she had "undergone a number of transfusions far exceeding the three transfusions in six

3    months" required by Listing 5.02, the method by which her transfusions were administered by

4    the hospital did not neatly fit the listing requirements.  AR 551 (asserting that Plaintiff "was

5    frequently given one transfusion at a time, over the course of a few days per hospitalization,

6    and then there would be a gap until the next hospitalization where [Plaintiff] would again

7    require a transfusion").  Plaintiff noted that "[w]here she falls [short of the listing] is not the

8    number of transfusions, not even the number of units, if they are added together," but "is

9    simply [that the transfusions] are frequently given as one unit at a time over the course of a

10   few day[s] hospital stay."  AR 552.  Plaintiff again summarized for the ALJ the numerous

11   medical records regarding her blood transfusions, and argued that the ALJ should find that she

12   "equal[ed]" Listing 5.02 because the hospitals' method of administering the transfusions over

13   the course of several days during each hospital stay equaled the requirements set forth in the

14   listings.  AR 551-52.

15   In the December 2022 decision, the ALJ concluded generally at the beginning of her

16   step three analysis that Plaintiff did "not have an impairment or combination of impairments

17   that meets or medical equals the severity of one of the listed impairments." AR 507.  In

18   support, the ALJ generally found that "[t]he record does not establish the medical signs,

19   symptoms, laboratory findings, or degree of functional limitation required to meet or equal the

20   criteria of any listed impairment *and no acceptable medical source designated to make*

21   *equivalency findings had concluded that the claimant's impairment(s) medically equal a listed*

22   *impairment.*"  AR 507 (emphasis added).  The ALJ subsequently continued on to address the

23   specific listings at issue in the case, including Listings 1.18, 1.17, 1.15, and 5.02.  AR 507-09.

1    In addressing Listing 5.02, the ALJ found that Plaintiff did not "meet" the listing

2 because there was not "sufficient objective evidence to corroborate receipt of blood

3 transfusions at least [three] times with a consecutive [six]-month period."  AR 509.  In

4 support, the ALJ cited multiple medical records, and found that "the number of units

5 [Plaintiff] received via transfusion during some of the[] episodes [wa]s unknown [because]

6 the specific hospitalization records are not included in the record."  AR 509.  The ALJ,

7 however, did not specifically address Plaintiff's equivalence arguments regarding Listing 5.02

8 made prehearing and at the hearing.  AR 508-09.

9    Plaintiff makes several arguments, as detailed below, in contending that the ALJ erred

10 when she failed to adequately consider whether Plaintiff's impairments equaled the relevant

11 listings.

12    At step three, the ALJ considers whether the claimant has an impairment, or

13 combination of impairments, that meets or equals a listed impairment under 20 C.F.R. pt. 404,

14 subpt. P, App. 1.  *See Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).  "If the claimant

15 meets or equals one of the listed impairments, a conclusive presumption of disability applies."

16 *Marcia v. Sullivan*, 900 F.2d 172, 174 (9th Cir. 1990).  "An ALJ must evaluate the relevant

17 evidence before concluding that a claimant's impairments do not meet or equal a listed

18 impairment."  *Lewis v. Apfel*, 236 F.3d 503, 512 (9th Cir. 2001).  "A boilerplate finding is

19 insufficient to support a conclusion that a claimant's impairment does not do so."  *Id.*

20 However, the ALJ need not discuss the findings in any specific section of her opinion.  *Id.* at

21 513 (noting that "*Marcia* simply requires an ALJ to discuss and evaluate the evidence that

22 supports his or her conclusion; it does not specify that the ALJ must do so under the heading

23 'Findings'").

ORDER REVERSING THE
COMMISSIONER'S DECISION - 9

1          **1.     Plaintiff's Equivalence Arguments Before the ALJ**

2          Plaintiff argues that the ALJ failed to adequately address whether her gastrointestinal

3    hemorrhaging equaled Listing 5.02.  Dkt. 14 at 5-6.  Plaintiff additionally contends that the

4    ALJ should have considered whether the combined impact of her gastrointestinal

5    hemorrhaging along with other "multiple related impairments" equaled a listing.  Dkt. 14 at 6-

6    7 (citations omitted).

7          The Commissioner counters that Plaintiff did not advance a sufficient argument prior

8    to the hearing regarding medical equivalence, and, therefore, the ALJ was not required to

9    consider either of Plaintiff's above two equivalence arguments.  Dkt. 20 at 3-4 (citing

10   *Kennedy v. Colvin*, 738 F.3d 1172, 1178 (9th Cir. 2013)).

11         The Court agrees with the Commissioner that Plaintiff failed to raise before the ALJ

12   one of the equivalency arguments she advances before this Court – the argument based on her

13   combined impairments; and, as a result, the ALJ did not error in failing to address it.  *See*

14   *Kennedy*, 738 F.3d at 1178 (citation and internal quotation marks omitted) (holding an "ALJ

15   is not required to discuss the combined effects of a claimant's impairments or compare them

16   to any listing in an equivalency determination, unless the claimant presents evidence in an

17   effort to establish equivalence"); *accord Lewis*, 236 F.3d at 514**.**

18         However, the Commissioner misconstrues and ignores Plaintiff's prehearing brief and

19   hearing arguments before the ALJ regarding equivalence under Listing 5.02.  As described

20   above, and as Plaintiff notes in reply, Plaintiff in fact presented the same theories as those

21   raised before this Court as to why her gastrointestinal hemorrhaging equaled Listing 5.02.[10]

22   *See* Dkt. 21 at 2; AR 977-78, 551-52.

23   _____

[10] Given this conclusion, the Court need not reach Plaintiff's alternative argument in her reply
regarding *Kennedy*'s application of a multi-part listing.  Dkt. 21 at 3-4 (discussing 738 F.3d 1172).

ORDER REVERSING THE
COMMISSIONER'S DECISION - 10

1   Accordingly, the ALJ was required to address Plaintiff's Listing 5.02 equivalence

2   argument, and *Kennedy,* relied on by the Commissioner, does not suggest otherwise.  *See* 738

3   F.3d at 1178; *see also* Dkt. 21 at 4.

### 2.   ALJ's Failure to Develop the Record and Consider Relevant Evidence Regarding Equivalence

5   Plaintiff additionally argues that the ALJ failed to consider all of the relevant evidence

6   regarding Listing 5.02, including failing to "acknowledge" all of the blood transfusions she

7   received.  Dkt. 14 at 4.  Plaintiff contends that, in 2020, she received four transfusions – at

8   least two of which involved multiple units of blood – and that the ALJ was required to

9   consider whether the multiple transfusions equaled Listing 5.02.  Dkt. 14 at 5.

10   The Commissioner counters that the ALJ indeed considered all of the relevant

11   evidence "and then some."  Dkt. 20 at 4-5.  The Commissioner further argues that absent

12   "definite evidence of units per transfusion," Plaintiff was unable to demonstrate equivalence,

13   let alone that she met Listing 5.02.  Dkt. 20 at 4.

14   As noted, Plaintiff's blood transfusions occurred in 2020 and 2022, but several 2020

15   hospitalization/transfusion records were not included in the record.  *See* AR 1927, 1906, 1871,

16   2306, 2333, 2344, 2403, 2442, 2596, 514, 509.  Instead, the transfusions were confirmed by

17   Plaintiff's PCP, Dr. Dawson's visit notes from the same time period.  *See* AR 1927, 1906,

18   1871.  While some of Dr. Dawson's notes captured the quantity of blood transfused in 2020,

19   that was not the case for all of her records.  AR 1871.  For the reasons below, the Court finds

20   the ALJ failed to adequately develop the record regarding Plaintiff's 2020 hospitalizations and

21   blood transfusions.

22   In September 2022, Plaintiff informed the ALJ prior to her November 2022 hearing, as

23   required by 20 C.F.R. §§ 404.935 and 416.1535, that she had outstanding medical records that

1    she had requested but had not received.  AR 974.  Additionally, in her October 2022

2    prehearing brief, Plaintiff explained that she was having difficulty obtaining records

3    pertaining to her 2020 hospitalizations from St. Michael's Hospital, which Plaintiff stated was

4    part of the CHI Franciscan network, from whom she had requested the 2020 transfusion

5    records.  AR 976.  Although Plaintiff received her medical records from other sources within

6    the same CHI Franciscan network, Plaintiff informed the ALJ that the network failed to

7    provide her with the St. Michael's records.  AR 976.  Plaintiff further noted that state agency

8    physicians working on behalf of the SSA were similarly unsuccessful in obtaining the 2020

9    transfusion records.  AR 976; *see also* AR 6995-97.

10          At Plaintiff's November 1, 2022 hearing, the ALJ acknowledged Plaintiff's notice of

11   outstanding records.  AR 548.  In a discussion on the record with Plaintiff's counsel, the ALJ

12   also noted that the ALJ had since received additional electronic records from CHI Franciscan.

13   AR 548-49.  The ALJ and counsel attempted to ascertain whether any records remained

14   missing.  AR 548-49.  Plaintiff's counsel noted that they "can uncover what is missing," as the

15   ALJ went through the recently submitted records at the hearing, AR 548.  The ALJ responded

16   that "at least as of now, we do not know of anything outstanding."  AR 549.   Nevertheless,

17   the ALJ added that "[w]e will deal with what is missing or not, when reviewing the file," and

18   that, for the time being, "let's work with what we have."  AR 549.

19          Subsequently, at the hearing, in discussing Plaintiff's hospitalizations and transfusions,

20   Plaintiff's counsel again noted that she had outlined each of Plaintiff's hospitalizations in her

21   prehearing brief, but that she was missing some of the actual hospitalization records.  AR 578-

22   79; *see also* AR 551-52 (at November 2022 hearing, Plaintiff's counsel cites to Plaintiff's

23

1   primary care physician, Dr. Dawson's records regarding Plaintiff's 2020 hospitalizations and

2   transfusions instead of hospital records themselves).

3        Nevertheless, the ALJ's December 2022 decision, issued one month after the hearing,

4   simply notes in the ALJ's step three analysis and summary of the evidence, that Plaintiff's

5   2020 hospital records were "not included in the record." AR 509, 514. The record, however,

6   contains no further mention regarding the missing 2020 records that Plaintiff sought and

7   reported to the ALJ as outstanding, and that were discussed on the record at the November

8   2022 hearing. Instead, it appears that the ALJ simply ruled that the absence of the 2020

9   hospitalization records – and the pertinent information contained within those records –

10  commanded a finding that Plaintiff did not "meet" the relevant listing, Listing 5.02. AR 509.

11       Given the ALJ's notice regarding the outstanding 2020 hospitalization records, the

12  ALJ was required to further develop the record regarding the information contained in

13  Plaintiff's 2020 hospitalization records prior to simply concluding that Plaintiff failed to meet

14  the listing. *See Mayes v. Massanari*, 276 F.3d 453, 459-60 (9th Cir. 2001) (Although a

15  plaintiff bears the burden of proving disability, the ALJ has an affirmative duty to assist the

16  claimant in developing the record "when there is ambiguous evidence or when the record is

17  inadequate to allow for proper evaluation of the evidence.") (citation omitted); *Tonapetyan v.*

18  *Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001) (internal citations and quotations omitted) (an

19  ALJ "has an independent duty to fully and fairly develop the record"); *accord Heather Lee S.*

20  *v. Comm'r of Soc. Sec.*, No. C19-5576 MLP, 2020 WL 208045, at *3 (W.D. Wash. Jan. 14,

21  2020) (citing *Tonapetyan*, 242 F.3d at 1150-51) (ALJ erred in failing to fully develop record

22  where missing records were noted by Plaintiff).

23

1      There is no dispute that the record here was ambiguous regarding the quantity of blood

2  Plaintiff received during certain 2020 hospitalization transfusions.  "Ambiguous evidence, or

3  the ALJ's own finding that the record is inadequate to allow for proper evaluation of the

4  evidence, triggers the ALJ's duty to conduct an appropriate inquiry."  *Tonapetyan*, 242 F.3d at

5  1150-51 (internal quotation marks and citations omitted) (ALJ can satisfy duty to develop

6  record in a variety of ways, including "subpoenaing the claimant's physicians, submitting

7  questions to the claimant's physicians, continuing the hearing, or keeping the record open

8  after the hearing to allow supplementation of the record").  Here, because the ALJ based her

9  decision regarding Listing 5.02 on the very absence of the 2020 records, the ALJ's error in

10  failing to develop the record was harmful.  Accordingly, remand for further proceedings in

11  which the ALJ develops the record regarding the 2020 hospitalizations/transfusions is

12  warranted.

13      Turning then to Plaintiff's 2022 transfusions, Plaintiff suggests that the ALJ should

14  have, but failed, to consider all of the transfusions she received in 2022.  Dkt. 14 at 5-6.

15  Plaintiff argues the 2022 transfusions were also relevant to an equivalence analysis regarding

16  Listing 5.02.  Dkt. 14 at 6.  The Commissioner counters that the ALJ's detailed discussion of

17  Plaintiff's 2022 transfusions in later portions of the ALJ's decision was adequate.  *See* Dkt. 20

18  at 5.  Additionally, the Commissioner argues that because Plaintiff's 2022 blood transfusions

19  "stemmed from various circumstances during the relevant period," her condition could not

20  have equaled Listing 5.02.  Dkt. 20 at 5.

21

22

23

1    In reply, Plaintiff notes that Listing 5.02 refers to "[g]astrointestinal hemorrhaging

2  *from any cause*." Dkt. 21 at 4. [11]  Plaintiff further argues that the Commissioner's argument

3  constitutes improper *post hoc* analysis.  Dkt. 21 at 4.

4    The Court agrees that Listing 5.02 is not as limited as the Commissioner contends.  Its

5  reference to "[g]astrointestinal hemorrhaging *from any cause*" undermines the

6  Commissioner's argument regarding the 2022 transfusions.  Moreover, Plaintiff correctly

7  notes that the ALJ did not consider this issue.  *See Bray v. Commissioner*, 554 F.3d 1219,

8  1225-26 (9th Cir. 2009) (the Court is limited to the reasons provided by the ALJ).

9    Unlike Plaintiff's 2020 transfusion records, the ALJ appears to have possessed

10  complete hospital records for Plaintiff's 2022 transfusions.  *See* AR 2027-6797, 7000-156.

11  While Plaintiff again nevertheless suggests ambiguity exists with the 2022 records, that

12  ambiguity arises for different reasons than the ambiguity associated with the 2020 records.

13  Unlike the 2020 records, Plaintiff has not suggested that the 2022 transfusion records are

14  incomplete or outstanding.  Instead, Plaintiff contends the 2022 records support different

15  transfusion units of blood than what they appear to state.  *See* Dkt. 14 at 6 & n.1.  For

16  example, as noted above, Plaintiff argues that the February 26, 2022, and March 19, 2022,

17  transfusions actually involved two units of blood, contrary to what appears to be a reference to

18  only one unit in the relevant medical records.  *See* Dkt. 14 at 6.

19    Plaintiff further argues that the ALJ did not explicitly consider all of her 2022 blood

20  transfusions.  Dkt. 14 at 5-6.  The Court agrees.  The Court has reviewed the entirety of the

21  ALJ's decision, including the pages cited by the Commissioner.  *See* Dkt. 20 at 5 (citing AR

22

23  _____

[11] In reply, Plaintiff again mistakenly relies on the incorrect version of Listing 5.02.  However, the mistake is harmless given that all versions of the relevant listing contained the pertinent language referring to "[g]astrointestinal hemorrhaging *from any cause*."  20 C.F.R. § Pt. 404, Subpt. P, App. 1.

509-18).  While the record reveals at least six different blood transfusions during Plaintiff's

February-March 2022 hospitalization, the ALJ has listed and appears to have considered only

the one transfusion occurring on February 26, 2022.  *See* AR 509 (referencing a single

transfusion on February 26, 2022, in conjunction with ALJ's findings regarding Listing 5.02);

*cf.* AR 517-18 (in summary of evidence, referencing only the February 26, 2022 transfusion

when discussing February - March 2022 hospitalizations).

Given that the Court is already remanding for further proceedings, the Court remands

for the ALJ to additionally consider Plaintiff's argument that her 2022 transfusions equaled

Listing 5.02.  In doing so, the ALJ should explicitly consider all of the 2022 transfusions – not

just the one from February 26, 2022.

### 3.   Sufficiency of the ALJ's Existing Equivalency Findings

In addition to the above arguments, the Commissioner also counters that the ALJ in

fact adequately considered whether Plaintiff's medical impairments equaled Listing 5.02.

Dkt. 20 at 4.  Specifically, the Commissioner argues that the ALJ's statement that "no

acceptable medical source designated to make equivalency findings had concluded that the

claimant's impairment(s) medically equal a listed impairment," demonstrates that the ALJ

adequately considered whether Plaintiff's medical impairments equaled Listing 5.02.  AR

507.  In support, the Commissioner notes that state agency non-examining physicians, Drs.

Norman Staley and Robert Hander, proffered opinions in September 2019 and May 2020,

respectively, in which they both found that Plaintiff met no listings.  AR 587 (Dr. Staley's

consideration of Listings 1.03 and 1.04 regarding physical impairments); AR 605, 622 (Dr.

Hander's consideration of same listings).[12]  The Commissioner then suggests that the ALJ's

---

[12] The ALJ found both Drs. Staley's and Hander's opinions persuasive.  AR 521-22.

ORDER REVERSING THE
COMMISSIONER'S DECISION - 16

1   reliance on Drs. Staley's and Hander's opinions satisfied the controlling social security ruling

2   ("SSR"), SSR 17-2p, for purposes of a determination regarding medical equivalence.  Dkt. 20

3   at 4; *see* SSR 17-2p, Evidence Needed by Adjudicators at the Hearings and Appeals Council

4   Levels of the Administrative Review Process To Make Findings About Medical Equivalence,

5   2017 WL 3928306 (March 27, 2017) (replacing SSR 96-6p, Consideration of Administrative

6   Findings of Fact by State Agency Medical and Psychological Consultants and Other Program

7   Physicians and Psychologists at the Administrative Law Judge and Appeals Council Levels of

8   Administrative Review; Medical Equivalence, 1996 WL 362203 (July 2, 1996)).

9        Plaintiff replies that the ALJ's boilerplate finding regarding equivalence at the

10  beginning of the ALJ's step three analysis was insufficient under Ninth Circuit law.  Dkt. 21

11  at 4.  She contends that the ALJ here failed to "even acknowledge relevant evidence

12  suggesting [Plaintiff's] impairment is at least equal in severity," thus requiring remand.   Dkt.

13  21 at 4.  Moreover, Plaintiff argues that the ALJ could not have relied on Drs. Staley's and

14  Hander's opinions for an equivalence finding because:  (1) neither physician reviewed the

15  transfusion evidence from 2020-2022 upon which Plaintiff's equivalence argument was based

16  since the opinions predated that evidence (Drs. Staley's and Hander's review was limited to

17  2019 evidence, and 2020 is when the transfusions began); and (2) neither physician

18  considered Listing 5.02.  Dkt. 21 at 2-3.

19        Social Security Ruling 17-2p, effective March 27, 2017, requires that a decision of

20  medical equivalence at the ALJ level be based on one of three below specified types of expert

21  opinion in the record:

22        (1) a prior administrative medical finding from an MC or PC [Medical or
        Psychological Consultant] from the initial or reconsideration adjudication levels
23        supporting the medical equivalence finding; or

(2) ME [Medical Expert] evidence, which may include testimony or written responses to interrogatories, obtained at the hearing level supporting the medical equivalence finding; or

(3) a report from the Appeals Council's medical support staff supporting the medical equivalence finding.

2017 WL 3928306 at *3.

The Commissioner's suggestion that Drs. Staley's and Hander's 2019 and 2020 opinions constituted the "prior administrative medical finding . . . supporting [a] medical equivalence finding, from subsection (1) above, is misguided. First, neither physician considered Listing 5.02; and, second, neither physician considered the relevant medical evidence regarding Plaintiff's gastrointestinal hemorrhaging and related blood transfusions. *See* AR 587, 605, 602. Accordingly, neither opinion satisfied the above requirement from SSR 17-2p. *See, e.g., Lahman v. Colvin,* No. 3:13-CV-05879-RBL, 2014 WL 4409794, at *5 (W.D. Wash. Sept. 8, 2014) (holding that where neither state agency physician addressed Plaintiff's liver condition, the opinions did not sufficiently constitute evidence regarding the "judgment of a physician" on the issue of the medical equivalence of Listing 5.05 regarding chronic liver disease under the precursor SSR to 17-2p, SSR 96-6p).

Nor did the ALJ's boilerplate statements at the commencement of her step three analysis constitute sufficient equivalency findings regarding Listing 5.02. Established Ninth Circuit precedent dictates that where the record suggests a possibility the claimant's condition meets or equals a listed impairment, a boilerplate rejection at step three is reversible error unless the ALJ's discussion of the relevant medical evidence adequately supports the conclusion. *See Marcia*, 900 F.2d at 175–76; *Lewis*, 236 F.3d at 512.

1          The Court acknowledges, though, that since the Ninth Circuit decided *Lewis* and

2   *Marcia,* the SSA promulgated SSR 17-2p, which replaced SSR 96-6p.  2017 WL 3928306.

3   SSR 17-2p, unlike SSR 96-6p, contains language that appears to be in direct conflict with

4   established Ninth Circuit precedent regarding boilerplate equivalency findings.  *Id.* at *4.

5   Contrary to Ninth Circuit precedent, SSR 17-2p states that no explanation is required when

6   finding a claimant does not meet or equal a listing, and provides in pertinent part:

> 7          If an adjudicator at the hearings or [Appeals Council] level believes that the
>           evidence already received in the record does not reasonably support a finding that
> 8         the individual's impairment(s) medically equals a listed impairment, the
>           adjudicator is not required to articulate specific evidence supporting his or her
> 9         finding that the individual's impairment(s) does not medically equal a listed
>           impairment. Generally, a statement that the individual's impairment(s) does not
> 10        medically equal a listed impairment constitutes sufficient articulation for this
>           finding.  An adjudicator's articulation of the reason(s) why the individual is or is
> 11        not disabled at a later step in the sequential evaluation process will provide rationale
>           that is sufficient for a subsequent reviewer or court to determine the basis for the
> 12        finding about medical equivalence at step 3.

13   *Id.* at *4.

14          However, since SSR 17-2p took effect in March 2017, the Ninth Circuit has continued

15   to uphold and apply its precedent that "[a] boilerplate finding is insufficient to support a

16   conclusion" that a claimant's impairment does not meet or equal a listing – including in

17   appeals of applications filed post-March 2017, to which SSR 17-2p applies.  *See Valladares v.*

18   *Kijakazi*, No. 21-35379, 2022 WL 1262012, at *1 (9th Cir. Apr. 28, 2022) (boilerplate finding

19   insufficient); *Havens v. Kijakazi*, No. 21-35022, 2022 WL 2115109, at *1 (9th Cir. June 13,

20   2022) (affirming when ALJ "engaged with the record evidence" regarding the listings and did

21   not rely on boilerplate findings).  Like the Ninth Circuit and other district courts that have

22   addressed the issue, this Court will continue to follow Ninth Circuit precedent regarding

23   boilerplate equivalency findings given that SSRs, while binding on ALJs, do not carry the

1   "force of law." *See Bray*, 554 F.3d at 1224; *accord Jerry W. v. Comm'r of Soc. Sec.,* No.

2   4:18-CV-05144-JTR, 2019 WL 7819645, at *4 (E.D. Wash. June 28, 2019) (following Ninth

3   Circuit precedent instead of SSR 17-2p regarding boilerplate findings).  Moreover, the Court

4   also notes that regardless of the language employed by SSR 17-2p, the Court remains required

5   to consider whether substantial evidence supported the ALJ's decisions.  *See J.B. v. Kijakazi*,

6   No. 20-CV-06231-VKD, 2022 WL 282513, at *8 (N.D. Cal. Jan. 31, 2022) (noting conflict

7   between Ninth Circuit precedent and SSR 17-2p, applying substantial evidence standard, and

8   finding that ALJ's boilerplate conclusion was not supported by substantial evidence).

9          Here, as noted, the ALJ explained that Plaintiff did not "meet" Listing 5.02 because

10  the information regarding the specific units of blood Plaintiff received during the 2020

11  transfusions was missing.  AR 509.  Because the ALJ had a duty to further develop the record

12  regarding the missing information and failed to do so, this finding was in error.  Additionally,

13  aside from a boilerplate conclusion at the commencement of the step three analysis, the ALJ

14  failed to address at all in her specific discussion of Listing 5.02 whether Plaintiff's conditions

15  equaled that Listing.  AR 509.  Because Plaintiff sufficiently raised an equivalence argument

16  regarding Listing 5.02 before the ALJ, this, too, constituted error.  Thus, substantial evidence

17  did not support the boilerplate finding.

18         The ALJ's step three errors require remand for further proceedings.  *See Lewis*, 236

19  F.3d at 514; *Marcia*, 900 F.2d at 176.  On remand, the ALJ shall further develop the record

20  regarding the quantity of blood transfused in 2020, and on February 26, 2022, and March 19,

21  2022.  Additionally, the ALJ is required to consider whether Plaintiff's 2020 and/or 2022

22  transfusions meet and/or equal Listing 5.02, and to support her findings with a legally

23  sufficient discussion of the medical evidence.  In addressing Plaintiff's Listing 5.02

1  equivalency arguments, the ALJ is directed to develop the medical record further as

2  warranted, including, but not limited to, consulting an ME.  *See Tonapetyan*, 242 F.3d at

3  1150.  If, on remand, the ALJ chooses not to consult an ME regarding Plaintiff's equivalence

4  with Listing 5.02, the ALJ should explain why she believes that the evidence does not

5  reasonably support a finding that Plaintiff's 2020 and/or 2022 gastrointestinal hemorrhaging

6  medically equals Listing 5.02.

7       **B.      The ALJ Erred in Evaluating the Medical Opinion Evidence Regarding
                  Plaintiff's Mental Impairments.**

8

9       Plaintiff also challenges the ALJ's evaluation of medical opinion evidence regarding

10  her mental impairments from an examining psychologist.

11       On October 4, 2019, following an examination that included the administration of a

12  mental status examination ("MSE"), Washington State Department of Social & Health

13  Services ("DSHS") psychologist, Dr. J. Alex Crampton, diagnosed Plaintiff with panic

14  disorder, generalized anxiety disorder, and alcohol use disorder, in full sustained remission.

15  AR 1445.  Dr. Crampton opined that based on her mental impairments, Plaintiff possessed

16  three severe and four marked functional limitations.  AR 1445-46.  Specifically, Dr. Crampton

17  opined that Plaintiff possessed severe impairments in terms of her abilities to perform

18  activities within a schedule, maintain regular attendance, and be punctual; to communicate

19  and perform effectively in a work setting; to maintain appropriate behavior in a work setting;

20  and to complete a normal workday and work week without interruptions from psychologically

21  based symptoms.  AR 1445-46.  Dr. Crampton also opined that Plaintiff possessed marked

22  impairments in her abilities to perform routine tasks without special supervision; adapt to

23  change in a work setting; make simple work-related decisions; and to ask simple questions or

1  request assistance.  AR 1445.  In sum, Dr. Crampton opined that Plaintiff's mental

2  impairments overall resulted in marked limitations.  AR 1446.

3       Under regulations applicable to this case, the ALJ was required to articulate the

4  persuasiveness of each medical opinion, specifically with respect to whether the opinions are

5  supported and consistent with the record.  20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).  An

6  ALJ's consistency and supportability findings must be supported by substantial evidence.  *See*

7  *Woods v. Kijakazi*, 32 F.4th 785, 792 (9th Cir. 2022).

8       The ALJ found at step two that Plaintiff's mental impairments were not severe, and, at

9  step four, found that all of the medical opinions regarding Plaintiff's mental impairments were

10  "not persuasive."[13]  AR 503-05.  In rejecting Dr. Crampton's opinion, the ALJ found that it

11  lacked supportability and consistency.  AR 505.

12       The ALJ suggested Dr. Crampton's opinion lacked supportability because it was

13  prepared "several years ago" and was based on a one-time examination of Plaintiff.  AR 505.

14  The ALJ further found that the opinion was contrary to Dr. Crampton's own examination

15  findings, which showed "normal attention, cooperative behavior, normal thought processes,

16  thought content, and perceptions, intact memory, normal fund of knowledge, and intact/good

17  insight and judgment."  AR 505.

18       Plaintiff argues that the ALJ erred in discounting the opinion based on timing because

19  Dr. Crampton issued his opinion during the "middle of the relevant period."  Dkt. 14 at 9-10.

20  Plaintiff further contends the ALJ failed to adequately explain why or how Dr. Crampton's

21  own examination findings indeed contradict his opinion.  Dkt. 14 at 9-10.  In support, Plaintiff

22

23  [13] Plaintiff has not challenged the ALJ's rejection of the October 2019 and May 2020 opinions from non-examining state agency psychologists, Drs. Jan Lewis and Rita Flanagan, respectively.  AR 504-05, 586, 604.

ORDER REVERSING THE
COMMISSIONER'S DECISION - 22

1    notes that Dr. Crampton himself observed and recorded Plaintiff's symptoms of severe

2    anxiety, observable concentration issues, ruminative thoughts, and avoidance behaviors.  AR

3    1445-46.

4           In opposition, the Commissioner counters that the ALJ offered sufficient reasons

5    regarding her supportability findings, and notes as well the ALJ's suggestion that she

6    additionally discounted the opinion based on the one-time examination.  Dkt. 20 at 7-8.

7           For several reasons, the ALJ's supportability findings were not supported by

8    substantial evidence.  First, the ALJ failed to adequately explain how and/or why Dr.

9    Crampton's "normal" findings outweighed or undermined his other less favorable "abnormal"

10   findings regarding Plaintiff's "severely anxious" mood, her "tense and restless" effect, and the

11   results of the MSE, which indicated abnormal concentration.  AR 1447.

12          Second, the ALJ erred in discounting Dr. Crampton's October 2019 opinion simply

13   because it was completed several years prior to the November 2022 hearing date.  In doing so,

14   the ALJ ignored her obligation to consider and adjudicate the entire portion of the relevant

15   periods, which in this case, included nearly five years with Plaintiff's DIB claim and more

16   than three years for her SSI claim.  In particular, the relevant period for Plaintiff's DIB claim

17   in fact commenced in December 2017, such that the October 2019 opinion actually fell in the

18   middle of the DIB relevant period.  Dr. Crampton's opinion also fell squarely within the

19   relevant period for Plaintiff's SSI claim, which commenced in May 2019.

20          Third, the ALJ erred in discounting Dr. Crampton's opinion based simply on his role

21   as an examining psychologist.  The 2017 regulations that apply in this case eliminated

22   hierarchical distinctions between treating, examining, and non-examining opinions, and an

23   ALJ is not permitted to "'defer or give any specific evidentiary weight, including controlling

1    weight, to any medical opinion,' but must instead weigh various factors to evaluate the

2    persuasiveness of each medical opinion." *Andy v. Kijakazi*, No. 22-35934, 2023 WL

3    6620299, at *1 (9th Cir. Oct. 11, 2023) (quoting 20 C.F.R. § 416.920c(a)) (discussing *Woods*,

4    32 F.4th at 788–89).  In suggesting generally that an opinion from a one-time examining

5    psychologist is not supportable because of the single examination, the ALJ here misapplied

6    the 2017 regulations such that her supportability determination improperly hinged on Dr.

7    Crampton's status as an examining provider.[14]

8        Finally, the Court declines to consider the additional supportability reason(s) offered

9    by the Commissioner in opposition, which were not proffered by the ALJ – namely, that Dr.

10   Crampton's lack of record review and/or familiarity with the record undermined

11   supportability.  Dkt. 20 at 8.  Under *Bray*, the Court is limited to the reasons provided by the

12   ALJ.  554 F.3d at 1225-26 (court reviews ALJ's decision "based on the reasoning and factual

13   findings offered by the ALJ – not *post hoc* rationalizations that attempt to intuit what the

14   adjudicator may have been thinking").

15       Accordingly, the ALJ's supportability findings were not supported by substantial

16   evidence.  The Court thus turns to the ALJ's consistency findings regarding Dr. Crampton's

17   opinion, which if supported by substantial evidence, would themselves be sufficient to affirm

18   the ALJ's evaluation of the opinion.  *See Woods*, 32 F.4th at 792-94 & n.4 (consistency and

19   supportability constitute two distinct factors that should be treated separately).

20

---

21   [14] This Court has similarly recognized that even under the prior pre-March 2017 regulations, which
     permitted hierarchical distinctions based on a physician's status, status as an examining psychologist

22   "cuts both ways" and does not constitute a "standalone" reason to reject a medical opinion.  *See
     Raymond T. v. Comm'r of Soc. Sec.*, No. C22-0618-SKV, 2023 WL 315231, at *3 (W.D. Wash. Jan.

23   19, 2023) (concluding under prior regulations regarding medical opinions that ALJ's reliance on the
     "one-time" examining status of a psychologist and psychiatrist was not a legitimate reason to discount
     their opinions); *accord Guadalupe A. V. C. v. Comm'r of Soc. Sec.*, No. C23-1768-BAT, 2024 WL
     2350717, at *4 (W.D. Wash. May 23, 2024) (same).

ORDER REVERSING THE
COMMISSIONER'S DECISION - 24

1    As for consistency, the ALJ found that Dr. Crampton's opinion was inconsistent with

2    "the remaining evidence of record, which confirms occasional, general mild mental status

3    abnormalities on exams conducted during mid-2019 through mid-2020, despite consistent

4    medication noncompliance, but no significant mental status abnormalities on exams

5    conducted after that period, even without participation in formal mental health treatment."

6    AR 505 (citing generally to "Exh. 1F-6F, 10F-12F, 14F, 44F, and 48F").

7    Plaintiff asserts that the ALJ failed to address the full longitudinal record, and that the

8    ALJ improperly made consistency findings based on a single year (2019 through mid-2020)

9    within a multi-year relevant period.  Dkt. 14 at 10.  Plaintiff contends that the ALJ was not

10   permitted to simply ignore and/or refuse to adjudicate part of the relevant period.  Dkt. 14 at

11   10.

12   Plaintiff additionally argues that the ALJ "failed to actually address the longitudinal

13   record" in referencing only generally the medical exhibits in the record and in failing to

14   explain which of Dr. Crampton's particular opined limitations were undermined by which

15   objective evidence.  *See* Dkt. 14 at 10, 16.  Plaintiff also contends that the ALJ erred in

16   characterizing her abnormalities as "mild" or "insignificant," arguing that the record contained

17   sufficient evidence of "significant mental abnormalities," which existed for a period of at least

18   twelve months – and that were, therefore, consistent with Dr. Crampton's opined limitations.

19   Dkt. 14  at 13, 10-13 (citing AR 1357, 1360, 999, 1001, 1267, 1270, 1004, 1272, 1234, 1258,

20   1014, 1017, 1277-78, 1032, 1140, 1145, 1236-38, 1284, 1230-40, 1243-44, 1643-48, 1650,

21   1382-89, 1412-23, 1439, 1655-71).

22   The Commissioner counters that substantial evidence supported the ALJ's findings

23   regarding the medical evidence that conflicted with Dr. Crampton's opinion.  Dkt. 20 at 8.  In

1  support, the Commissioner argues that Plaintiff's mental health examinations, including those

2  cited by Plaintiff, were "largely benign – just as the ALJ found."  Dkt. 20 at 9.   The

3  Commissioner then provides numerous pinpoint citations to the record in support of the ALJ's

4  related findings – citations that were not provided by the ALJ who simply cited to the

5  evidence as a whole.  Dkt. 20 at 8-9.

6      The Court agrees that the ALJ erred in making consistency findings that failed to

7  account for the entire period.[15]  Notably, the ALJ's consistency findings do not address the

8  early part of the relevant period pertinent to Plaintiff's DIB claim, from December 2017, until

9  2019.  *See* AR 505 (comparing opinion with evidence beginning in 2019).  The Commissioner

10 erroneously suggests that the ALJ was permitted to focus her consistency findings on only

11 that evidence that postdated Dr. Crampton's opinion, citing to the "other factors" provision in

12 the regulation which permits the ALJ to consider new evidence.  *See* Dkt. 20 at 9 (citing 20

13 C.F.R. §§ 404.1520c(c)(5) and 414.920c(c)(5)) (noting that in addition to supportability and

14 consistency, the SSA will consider "other factors" in assessing a medical opinion, including

15 whether the "evidence show[s] a medical source has familiarity with the other evidence in the

16 claim;" and, in doing so, the SSA "will also consider *whether new evidence [the SSA]*

17 *receive[s] after the medical source made his or her medical opinion* or prior administrative

18 medical finding makes the medical opinion or prior administrative medical finding more or

19 less persuasive") (emphasis added).

20      At issue here, though, are the ALJ's *consistency* findings.  The consistency inquiry is

21 not limited to new evidence postdating Dr. Crampton's opinion, but is instead determined by

22

23 ───────────────
[15] However, the findings are not as limited as stated by Plaintiff.  The ALJ made consistency findings regarding the post-mid-2020 period, as addressed below.

ORDER REVERSING THE
COMMISSIONER'S DECISION - 26

1    looking more broadly at all of "the evidence from other medical sources and nonmedical

2    sources in the claim."  *See* 20 C.F.R. §§ 404.1520c(c)(2) and 414.920c(c)(2).  Here, the ALJ

3    failed to consider the evidence from nearly two years of the relevant DIB period from

4    December 2017-2019.[16]

5         As Plaintiff notes, the ALJ, however, clearly addressed the consistency of Dr.

6    Crampton's opinion with evidence from 2019-2020.  Additionally, the Court finds that the

7    ALJ also addressed the consistency of Dr. Crampton's opinion with evidence from mid-2020

8    and beyond.  *See* AR 505 (finding the opinion inconsistent "with the remaining evidence of

9    record" from those two periods).  Specifically, the ALJ found that Plaintiff's 2019-2020

10   MSEs demonstrated only "occasional, general mild mental status abnormalities," and that

11   Plaintiff's post-mid-2020 MSEs demonstrated "no significant mental status abnormalities."

12   AR 505.

13        In support of the consistency findings, the ALJ cited generally to approximately one

14   thousand undifferentiated pages from the administrative record.  AR 505 (citing "Exhibit 1F,

15   2F, 3F, 4F, 5F, 6F, 10F, 11F, 12F, 14F, 44F, 48F").  While the Commissioner now offers

16   pinpoint citations to record evidence in support of the ALJ's findings, the Court notes that the

17   more than one hundred citations provided by the Commissioner in his opposition brief were

18   *not* in fact articulated by the ALJ in support of her consistency findings.  *See* Dkt. 20 at 8-10.

19        Nevertheless, in accordance with *Kaufmann v. Kijakazi*, 32 F.4th 843, 851 (9th Cir.

20   2022), the Court has also reviewed "the ALJ's full explanation" for the consistency findings,

21   "scrutiniz[ing] all of the pages of [the] ALJ's decision" to ascertain whether other portions of

22

23   ───────────────
[16] The Court notes that it is unclear from Dr. Crampton's opinion itself whether he was opining regarding Plaintiff's limitations prior to the October 2019 date of the opinion.  *See* AR 1443-47.  On remand, the ALJ should consider the issue.

the ALJ's decision might enlighten the Court regarding the specific support for the ALJ's consistency findings.  *See* Dkt. 20 at 8-9 (citing *Kaufmann*, 32 F.4th at 851).   However, the specific record support for the ALJ's findings regarding Plaintiff's MSEs remains inadequate and unclear.[17]  *See* AR 504, 506 (ALJ's discussion of medical evidence regarding mental impairments).  Neither *Kaufmann* nor any other Ninth Circuit precedent permit the Court to manufacture *post hoc* findings or support for such findings where none exists.  *See Makenzie M. v. Comm'r of Soc. Sec.*, No. C22-5013-BAT, 2022 WL 2817086, at *1 (W.D. Wash. July 19, 2022) (rejecting similar argument regarding *Kaufmann*, and citing *Bray*, 554 F.3d at 1225-26).

The Court, therefore, declines the invitation to speculate regarding the ALJ's intended record support for her MSE consistency findings.  *See Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1103 (9th Cir. 2014) ("Although the ALJ's analysis need not be extensive, the ALJ must provide some reasoning in order for us to meaningfully determine whether the ALJ's conclusions were supported by substantial evidence."); *see also Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991) (explaining that "a reviewing court should not be forced to speculate as to the grounds for an adjudicator's rejection" of certain evidence). Given the record evidence demonstrating Plaintiff's long history of mental health issues, including evidence of her numerous prescribed psychiatric medications, multiple emergency room visits related to mental health decompensation, hospitalizations and inpatient treatment center stay(s), and pertinent records from Plaintiff's psychiatrist, counselor, and primary care

---

[17] As addressed below, earlier in her decision, the ALJ articulated specific record support for her findings regarding Plaintiff's "noncomplian[ce] with psychotropic medication."  AR 505 (noting Plaintiff's "consistent medication noncompliance" during 2019 through mid-2020, in conjunction with consistency findings); AR 504 (citing AR 997, 1136, 1140, 1382-83, 1413).

1   physician, on remand, the ALJ should reconsider the MSE findings, citing to adequate record

2   support for the ALJ's reconsidered consistency findings.  *See, e.g.,* AR 1412-13, 1439.

3          The Court thus turns to the ALJ's additional findings regarding Plaintiff's "consistent

4   medication noncompliance" and the absence of "participation in formal mental health

5   treatment [after 2020]."  *See* AR 505; AR 504 (citing AR 997, 1136, 1140, 1382-83, 1415, in

6   support of Plaintiff's "noncomplian[ce] with use of psychotropic medication" in 2019).

7   Those findings similarly fail to support the ALJ's consistency determination regarding Dr.

8   Crampton's opinion.

9          In support of the ALJ's finding regarding Plaintiff's 2019-2020 "medication

10  noncompliance," the ALJ appears primarily to rely on Plaintiff's benzodiazepine dependence

11  and overuse of other psychiatric medications – a condition for which Plaintiff received

12  inpatient treatment in July-August 2019.  AR 505 (citing AR 997-99 (November 2019

13  emergency room records confirming that Plaintiff overused her anxiety medications after

14  experiencing a panic attack); AR 1140 (March 2019 emergency room visit records stating that

15  Plaintiff, who has a "known history of schizoaffective disorder, anxiety, bipolar disorder and

16  depression" and is followed by a psychiatrist, was brought in by her mother after overusing

17  sertraline while feeling anxious and overwhelmed); AR 1382-83 (July 2019 emergency room

18  visit records in which Plaintiff admitted to taking some of her psychiatric medications early

19  "because of wanting to relieve symptoms")).

20         The ALJ, however, failed to explain how Plaintiff's noncompliance rendered Dr.

21  Crampton's opinion inconsistent with the medical record and/or undermined Dr. Crampton's

22  opined limitations.  Indeed, in his opinion, Dr. Crampton explicitly accounted for Plaintiff's

23  noncompliance and the fact that she required inpatient mental health treatment in 2019, as a

1  result of her dependence on certain psychiatric medications.  AR 1444 (noting that Plaintiff

2  was admitted to Pacific Hope for treatment in 2019 to withdraw from "benzos" and Seroquel,

3  and to "stabilize" her on a more effective psychiatric "medication regimen"); *see also Lyon v.*

4  *Colvin*, No. 3:14-CV-05870-KLS, 2015 WL 3482153, at *5 (W.D. Wash. June 2, 2015)

5  (holding that ALJ erred in relying on Plaintiff's marijuana use and/or prescription medication

6  overuse as a reason for discounting examining psychologist's opinion where the psychologist

7  was aware of the overuse and the ALJ "fail[ed] to point to any evidence in the record that such

8  use or overuse actually caused the type of mental health symptoms [the] plaintiff reported and

9  [the psychologist] found").

10  Furthermore, it is unclear whether, in relying on Plaintiff's noncompliance, the ALJ

11  intended to suggest that Plaintiff's mental health impairments were not as limiting as opined

12  by Dr. Crampton and/or that Plaintiff's symptoms were caused by her benzodiazepine

13  dependence and/or withdrawal as opposed to her other mental impairments.[18]  Either way, the

14  Court declines to speculate regarding the ALJ's reasoning.[19]

15  _____

16  [18] The ALJ did not find Plaintiff's benzodiazepine dependence to be a severe impairment; nor did the
   ALJ address the role of the dependence with respect to Plaintiff's symptoms and impairments.  To the

17  extent that the ALJ intended to rely on Plaintiff's benzodiazepine dependence as a reason for rejecting
   medical opinion evidence and testimony, the Court notes that the ALJ should have addressed the
   necessity of a DAA analysis.  *See* SSR 13-2p, Evaluating Cases Involving Drug Addiction &

18  Alcoholism (DAA), 2013 WL 621536, at *1 (Feb. 20, 2013) (noting that "Substance Use Disorders"
   include "the presence of maladaptive use of alcohol, illegal drugs, prescription medications, and toxic

19  substances"); *see also Parra v. Astrue*, 481 F.3d 742, 746-48 (9th Cir. 2007) (describing two-round
   process utilized in DAA cases).

20
   [19] To the extent that the ALJ was suggesting that Plaintiff's benzodiazepine dependence caused her

21  mental symptoms, the Court notes the ALJ failed to discuss evidence demonstrating that that Plaintiff
   continued to experience mental health symptoms during the time period following her August 2019
   completion of inpatient treatment benzodiazepine withdrawal – and, at a time when Plaintiff was

22  adhering to her prescribed medication regimen.  *See* AR 1909 (increasing anxiety in May 2020); AR
   1874 (increasing depression and anxiety symptoms in November 2020); AR 1836 (increasing anxiety

23  in April 2021); AR 1834, 1809 (anxiety and depression in May and August 2021).  Plaintiff also
   continued to require multiple psychiatric medication changes by her primary care physician, Dr.
   Dawson, post-mid-2020.  *See* AR 1909, 1874, 1858, 1836, 1834, 1809.

1          Finally, the ALJ failed to account for the role that Plaintiff's mental impairments

2    played in her medication noncompliance.  An ALJ may discount a claimant's symptom

3    testimony based on the claimant's unexplained or inadequately explained failure to follow a

4    prescribed course of treatment.  *See* SSR 16-3p, Titles II and XVI:  Evaluation of Symptoms

5    in Disability Claims, 2017 WL 5180304, at *9-10 (Oct. 25, 2017); *Rounds v. Comm'r Soc.*

6    *Sec. Admin.*, 807 F.3d 996, 1006 (9th Cir. 2015).  However, where, as here, there is evidence

7    that the mental illness itself appears to be a cause of the claimant's noncompliance, the AJL

8    should address that possibility and explain why she is relying on the claimant's

9    noncompliance despite the fact it might be caused by Plaintiff's mental illness itself.  *See*

10   *Garrison v. Colvin*, 759 F.3d 995, 1018 (9th Cir. 2014) ("[W]e do not punish the mentally ill

11   for occasionally going off their medication when the record affords compelling reason to view

12   such departures from prescribed treatment as part of claimants' underlying mental

13   afflictions.").

14         The ALJ also cited Plaintiff's absence of "participation in formal mental health

15   treatment" for the period following mid-2020 as a reason that Dr. Crampton's opinion lacked

16   consistency with the record.  AR 505.  The record demonstrates that Plaintiff discontinued

17   counseling and medication management with Kitsap Mental Health Services ("Kitsap") in

18   Spring 2020, at a time that coincided with the deterioration of her physical impairments,

19   which increasingly required hospitalization and the need for more urgent medical care.  AR

20   1694-97, 1927, 1906.

21         Even though Plaintiff no longer treated with a psychiatrist after she terminated care

22   with Kitsap, she nevertheless continued to receive psychiatric medication management from

23   her primary care physician, Dr. Dawson, from 2020, through the time of the November 2022

hearing.  *See* AR 1909, 1874, 1858, 1836, 1834, 1809.  "Contrary to the ALJ's assertion, 'medication management' by a primary care provider, including the prescribing of psychotropic medication for depression and anxiety, as opposed to by a mental health specialist, still [constitutes] formal mental health treatment, and is not a proper basis to discredit a claimant's complaints or a doctor's opinions of limitations."  *Dean v. Colvin*, No. 13-CV-05369 JRC, 2014 WL 1364951, at *5 (W.D. Wash. Apr. 7, 2014) (citing *Sprague v. Bowen*, 812 F.2d 1226, 1232 (9th Cir. 1987)); *see also Schiaffino v. Saul*, 799 F. App'x 473, 476 (9th Cir. 2020) (holding that ALJ erred in rejecting opinion based on Plaintiff's irregular treatment with a psychiatrist); *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996) ("in the case of a mental health disorder, failure to seek treatment may be an unfortunate result of the disorder").

For the above reasons, neither the ALJ's supportability findings nor her consistency findings were supported by substantial evidence.  Because the ALJ relied in part on her evaluation of Dr. Crampton's opinion in assessing Plaintiff's RFC, the error was not harmless.

Moreover, as noted, the ALJ here rejected *all* of the medical opinions regarding Plaintiff's mental impairments, and appears to have at least in part inappropriately substituted her own opinion and independently assessed how Plaintiff's mental impairments impacted her ability to work.  *See Matthew N. C. v. Comm'r of Soc. Sec.*, No. 3:19-CV-05112-DWC, 2019 WL 4439890, at *4 (W.D. Wash. Sept. 17, 2019) (discussing *Banks v. Barnhart*, 434 F. Supp. 2d 800, 805 (C.D. Cal. 2006)) (noting "the ALJ's RFC determination or finding must be supported by medical evidence, particularly the opinion of a treating or an examining physician"); *Burget v. Comm'r of Soc. Sec.*, No. C17-1836 BAT, 2018 WL 4204057, at *3 (W.D. Wash. Sept. 4, 2018) (quoting *Padilla v. Astrue*, 541 F. Supp. 2d 1102, 1106 (C.D. Cal.

1    2008)) ("[A]s a lay person, an ALJ is 'simply not qualified to interpret raw medical data in

2    functional terms.'").  On remand, the ALJ should appropriately develop the record as

3    warranted, and should consider the necessity of a medical expert ("ME") or further

4    consultative examination ("CE") in readjudicating the issues related to Plaintiff's mental

5    impairments, including the evaluation of Dr. Crampton's opinion.

6    **C.      The ALJ Erred in Evaluating Plaintiff's Testimony.**

7           Finally, Plaintiff additionally challenges the ALJ's evaluation of her testimony.

8           At the time Plaintiff filed for benefits in 2019, she asserted several mental

9    impairments, including panic disorder, generalized anxiety, depressive disorder, and alcohol

10   use disorder in remission, along with multiple physical impairments, including

11   hyperlipidemia, chronic right hip pain, post-hip replacement, joint and muscle pain, anemia,

12   hypertension, and history of bleeding stomach ulcers.  AR 799.  In her November 2019

13   function report, Plaintiff noted that she was able to take care of her own hygiene, prepare

14   simple meals, and to care for pets.  AR 891-92.  Plaintiff further noted that she was able to

15   complete household chores, to shop, pay bills, and manage her finances.  AR 893-94.

16          In her 2019 function report, Plaintiff stated that although she was able to get out of the

17   house, she was "relearn[ing] how to deal with panic [and] social anxiety since being off of

18   benzodiazepines." AR 891, 894.  She reported that she struggled with change and was

19   overwhelmed by stress.  AR 896.  Plaintiff added that she was only able to sleep four hours

20   per night due in part to hip and back pain, and that she was unable to walk as much as she was

21   previously able to after a March 2019 hip surgery.  AR 890-91, 894.  Plaintiff also noted that

22   she experienced "difficulty squatting[,] bending[, and] standing [for a] long time due to joint

23

1    pain and muscle stiffness;" that she could walk for approximately one hour prior to stopping

2    to rest; and that she was "tired after one flight of stairs."  AR 895.

3          At the November 2022 hearing three years later, Plaintiff subsequently testified that

4    her health issues had worsened since her alleged onset date – at which point she testified that

5    she had been largely suffering from mental health issues, which she erroneously believed at

6    the time were also responsible for her "stomach issues."  AR 560.  However, as of November

7    2022, Plaintiff testified that "caring for [her] stomach issues" was the greatest obstacle to

8    employment because her stomach issues were "impossible and unpredictable" in terms of her

9    need for a bathroom and her need for hospitalization.  AR 572.

10         In her November 2022 testimony, Plaintiff suggested that she had been wrong

11   regarding the cause of her stomach issues, explaining that she has since "been in and out of

12   the hospital;" needs regular blood transfusions for anemia; is frequently unable to eat

13   regularly because she does not feel well; and suffers from constant bathroom issues.  AR 561.

14   She testified that since 2020, she had undergone at least three to four major surgeries for her

15   digestive issues, and she estimated that she averaged several hospitalizations per year during

16   2020-2022.  AR 569.

17         Plaintiff explained that she experiences digestive issues and flare ups every day,

18   including muscle tightness, cramping, diarrhea, and vomiting.  AR 569-70.  She noted that she

19   is hospitalized when her flare ups and/or bleeding are "at a dangerous level."  AR 569.

20   Plaintiff noted in 2022, that she was struggling to eat and "survive," and that, given her

21   impairments and symptoms, it would be "nearly impossible" to dedicate herself to a job.  AR

22   561.

23

1    Plaintiff elaborated that she also has regular appointments with a hematologist to

2    receive iron regularly, and that she suffers from anxiety "all of the time."  AR 561-62.

3    Plaintiff additionally noted that she experiences chronic pain and injures easily, and had back

4    problems, a hip replacement, and a broken ankle.  AR 562.  Plaintiff stated that she gets

5    injections for the pain, and that there are "a lot of side effects . . . from being on that amount

6    of medication."  AR 562.

7    Plaintiff explained that, in 2022, she lived with her parents, and that she can typically

8    care for herself and help with household chores except for times when she is feeling too sick

9    or when she has just come home from the hospital.  AR 563.  She sometimes accompanies her

10   mom when her mom cares for Plaintiff's nephews.  AR 564.  Plaintiff explained that she just

11   does "little bits at a time" as a result of her digestive flare ups.  AR 571.

12   The ALJ found that Plaintiff's "medically determinable impairments could reasonably

13   be expected to cause the alleged symptoms" but that her "statements concerning the intensity,

14   persistence, and limiting effects of the[] symptoms [were] not entirely consistent with the

15   medical evidence and other evidence in the record," and no affirmative evidence of

16   malingering.  AR 510.  Accordingly, the ALJ was required to provide "specific, clear and

17   convincing reasons" for rejecting Plaintiff's testimony concerning the intensity, persistence,

18   and limiting effects of his symptoms.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir.

19   2008) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996)); *accord Smartt v.

20   Kijakazi*, 53 F.4th 489, 499 (9th Cir. 2022) (confirming that the "clear and convincing"

21   standard continues to apply).

22   In support, the ALJ stated that the "medical evidence [did] not fully corroborate

23   [Plaintiff's] testimony," and then summarized the medical evidence over the next ten pages of

1    the decision.  AR 510-20.  Following that ten-page summary, the ALJ found that "the record

2    is absent sufficient objective evidence to support [Plaintiff's] allegation[s], as examinations

3    have revealed normal heart and lungs, an otherwise normal, soft abdomen, with no distension,

4    masses, or ascites, and normal abdominal sounds, intact reflexes, generally normal sensation,

5    normal extremity movements, otherwise normal range of motion, full upper extremity,

6    strength, and a generally normal gait with independent ambulation."  AR 519-20.  In support

7    of this broad finding regarding Plaintiff's physical impairments, the ALJ generally cited to

8    more than 6000 undifferentiated pages of the medical record, again with no specific record

9    citations.  AR 519-20.

10        For the same reasons discussed above regarding Dr. Crampton's opinion, the ALJ's

11   failure to provide adequate, specific support for the findings constituted error.  *See Treichler*,

12   775 F.3d at 1103; *see also Bunnell*, 947 F.2d at 346 (9th Cir. 1991).  The Court is again

13   unwilling to speculate regarding which of the 6000 pages of record evidence generally cited

14   by the ALJ included the support the ALJ intended for the findings regarding Plaintiff's

15   various physical impairments.  *See* Dkt. 20 at 15 (suggesting pinpoint record citations the ALJ

16   may have intended to rely upon); *see also Lambert v. Saul,* 980 F.3d 1266, 1277-78 (9th Cir.

17   2020) (quoting *Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015)) (holding that

18   although an ALJ provided a detailed overview of the medical evidence in the record, the ALJ

19   failed to provide an adequate reason for rejecting Plaintiff's testimony because "providing a

20   summary of medical evidence . . .  is not the same as providing clear and convincing reasons

21   for finding a claimant's symptom testimony not credible," and the ALJ was instead required

22   to link the testimony she found not credible with the evidence from the record that

23   contradicted that testimony)).  Nor does the Court's close review of the ALJ's ten-page

1  summary of the evidence clarify the intended support for the ALJ's findings.  *See* AR 510-20;

2  *see also Kaufmann,* 32 F.4th at 851.

3       The ALJ additionally suggested that Plaintiff had experienced improvement in her

4  physical impairments with physical therapy, injection therapy, and iron infusions.  AR 521.

5  Again, the ALJ failed to provide adequate and specific citations to the record.  AR 521.

6  However, even more significantly, the ALJ failed to consider the entirety of the relevant

7  periods at issue, and in doing so, ignored the deteriorating trajectory of Plaintiff's

8  gastrointestinal impairments and related symptoms, including her numerous hospitalizations

9  and blood transfusions in 2020-2022, as detailed above in the Court's discussion of the step

10  three issue.  *See* Dkt. 14 at 18-19; *see also, e.g.,* AR 1776 (in April 2022, Plaintiff experienced

11  cardiac arrest prior to surgery on a perforated duodenal ulcer, ended up in the ICU with fluid

12  overload, and was hospitalized for more than two months); AR 347-488 (new evidence

13  exhibited by the Appeals Council); AR 153-54, 381-424 (medical records demonstrating that

14  Plaintiff was hospitalized and/or in skilled nursing centers for at least five months in 2023 for

15  gastrointestinal conditions including but not limited to post vagotomy diarrhea,

16  hemoconcentration, hypokalemia, diabetes, gastroenteritis, and that, during that time, Plaintiff

17  lost much of her body weight, and required a cardiac monitor, wheelchair, and walker).[20]

18

19  [20] As noted, the Court has, as required, considered the 367 pages of new evidence that the Appeals
Council itself considered in denying review of the ALJ's decision. *See Brewes,* 682 F.3d at 1162-63.

20  The new evidence includes additional hospitalization records and skilled nursing home records from
2022-2023, some of which postdate the ALJ's December 12, 2022 decision by just a few months.  The

21  Court notes, though, that nearly all of the new evidence predated Plaintiff's March 31, 2023 DLI for
purposes of her DIB claim.  AR 501.  Having reviewed the 387 pages of new evidence considered by

22  the Appeals Council, the Court finds that the post-December 2022 new evidence – even that which
post-dates Plaintiff's March 31, 2023 DLI – is relevant to the Court's review of the ALJ's decision

23  because the new evidence very clearly relates to the same chronic conditions the ALJ evaluated in her
decision. *See Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1232 (9th Cir. 2011) (citations
omitted) (Ninth Circuit law is clear that "medical evaluations made after the expiration of a claimant's

1    Additionally, regarding Plaintiff's physical impairments, the ALJ suggested the

2    existence of "periods of treatment noncompliance." AR 521. However, in support, the ALJ

3    again cited to 6000 undifferentiated pages from the longitudinal record, and it is unclear what

4    noncompliance the ALJ was referencing and/or how and why such noncompliance

5    undermined Plaintiff's testimony regarding her physical impairments. AR 521.

6    Finally, the ALJ found that Plaintiff's activities of daily living ("ADLs") undermined

7    her testimony. AR 520. In support, the ALJ cited exclusively to Plaintiff's activities prior to

8    the deterioration of her gastrointestinal impairments in April 2020, ignoring the latter portions

9    of the DIB and SSI relevant periods. AR 520. Moreover, the ALJ also failed to adequately

10   explain how the cited ADLs – which included hygiene care, the completion of household

11   chores, the preparation of simple meals, housesitting for family members in 2019, and a failed

12   part-time work attempt in early 2020 – in fact undermined Plaintiff's testimony regarding the

13   numerous symptoms associated with her multiple physical and mental impairments. *See* AR

14   520. The Ninth Circuit recognizes that, "the mere fact that a plaintiff has carried on certain

15   daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does

16   not in any way detract from [his] credibility as to [his] overall disability." *Vertigan v. Halter*,

17   260 F.3d 1044, 1050 (9th Cir. 2001) (citations omitted); *see also Reddick v. Chater*, 157 F.3d

18

19   _____

20   insured status are relevant to an evaluation of the pre-expiration condition"); *see also Nerurkar v. Astrue*, No. C09-1541-RAJ-BAT, 2010 WL 2569157, at *5 (W.D. Wash. May 10, 2010), report and recommendation adopted, No. C09-1541-RAJ, 2010 WL 2569063 (W.D. Wash. June 21, 2010) (citing

21   *Smith v. Bowen*, 849 F.2d 1222, 1225 (9th Cir. 1988)) (holding "it is clear that reports containing observations made after the period for disability are relevant to assess the claimant's disability"); *see*

22   *also Svaldi v. Berryhill*, 720 F. App'x 342, 343–44 (9th Cir. 2017) (holding that where medical opinions "refer back" to the same chronic condition and symptoms discussed in earlier medical

23   records, the "fact that [the most recent] opinions were issued significantly after claimant's DLI does not undercut the weight those opinions are due").

1    715, 722 (9th Cir. 1998) (citations omitted) ("disability claimants should not be penalized for

2    attempting to lead normal lives in the face of their limitations"). "One does not need to be

3    'utterly incapacitated' in order to be disabled." *Vertigan*, 260 F.3d at 1050 (citations omitted).

4    The ALJ thus erred with this reason for rejecting Plaintiff's testimony.

5         Accordingly, the ALJ failed to provide sufficiently specific, clear, and convincing

6    reasons for rejecting Plaintiff's testimony regarding her physical impairments.

7         The same is true of the ALJ's evaluation of Plaintiff's mental impairment testimony.

8    Unlike Plaintiff's physical impairments, the ALJ rejected Plaintiff's mental impairment

9    testimony in conjunction with the ALJ's determination that Plaintiff's mental impairments

10   were not severe at step two.[21]   *See* AR 503-04.   In discounting the testimony, the ALJ made

11   findings nearly identical to those the ALJ offered in rejecting Dr. Crampton's opinion.   *See*

12   AR 503-04; *cf.* AR 505.

13        First, the ALJ suggested Plaintiff's testimony was inconsistent with treatment notes

14   that showed she was "consistently alert and oriented, with good hygiene, appropriate/good eye

15   contact, adequate grooming, intact language, memory, attention, concentration, and

16   associations, normal cognition, perceptions, thought content, and thought processes, otherwise

17   normal, coherent speech, a euthymic mood at times, an often full affect, intact fund of

---

18   [21]The ALJ's consideration of the Plaintiff's mental impairment testimony during step two of her

19   analysis as opposed to step four was harmless given that "an additional [step two] severe impairment
     has no impact on an ALJ's residual functional capacity ("RFC") analysis because the ALJ is required

20   to consider all the claimant's impairments [at step four], regardless of severity."   *Kelley v. Kijakazi*,
     No. 22-16775, 2023 WL 6999445, at *1 (9th Cir. Oct. 24, 2023) (discussing *Buck v. Berryhill*, 869

21   F.3d 1040, 1049 (9th Cir. 2017) ("[i]n assessing RFC, the adjudicator must consider limitations and
     restrictions imposed by all of an individual's impairments, even those that are not 'severe'")); *see also*

22   *McGuire v. Kijakazi*, No. 20-35898, 2021 WL 5861284, at *1 (9th Cir. Dec. 7, 2021) (finding that the
     ALJ's error at step two was harmless since the ALJ considered the non-severe impairment later in the
     inquiry).  Here, the ALJ simply conducted what constituted the requisite step four analysis as to

23   Plaintiff's mental impairments in conjunction with her step two analysis.  Nevertheless, the Court
     notes that, for clarity and to avoid any confusion, in the future, the ALJ should be mindful to label her
     step four analysis as such.

1    knowledge, and good insight and judgment." AR 503-04. Again, though, the ALJ failed to

2    provide adequate, specific record citations in support of these findings, and the Court declines

3    to *post hoc* manufacture support for the ALJ's findings.

4           Additionally, like Dr. Crampton's opinion, the ALJ also cited Plaintiff's

5    noncompliance with psychotropic medications and failure to "participate[] in formal mental

6    health treatment since 2020." AR 504. These findings fail for the same reasons as those

7    discussed above with Dr. Crampton's testimony. Furthermore, to the extent the ALJ intended

8    the ADL findings to apply as well to Plaintiff's testimony regarding her mental impairments,

9    those findings were insufficient for the same reasons discussed above regarding Plaintiff's

10   physical impairment testimony.

11          In sum, the ALJ failed to state any specific, clear, and convincing reasons that justified

12   her rejection of Plaintiff's testimony regarding her physical and mental impairments and their

13   symptoms. Remand is required for the ALJ to reconsider Plaintiff's testimony regarding both

14   her physical and mental impairments. In doing so, the ALJ should consider the entire relevant

15   SSI and DIB periods, and should "link" any rejected testimony "to [the] particular parts of the

16   record supporting the adverse credibility determination." *Morsea v. Berryhill*, 725 F. App'x

17   463, 465 (9th Cir. 2018) (citing *Brown-Hunter*, 806 F.3d at 493–94); *see also Lambert*, 980

18   F.3d at 1277 (citing *Treichler*, 775 F.3d at 1102) (holding that ALJ is required to "specifically

19   identify the testimony [from a claimant] [they] find[] not to be credible and . . . explain what

20   evidence undermines that testimony").

21          **D.    Remedy**

22          Plaintiff asks the Court to remand for further proceedings. Dkt. 14 at 19. The Court

23   agrees that outstanding issues remain for which further proceedings would be helpful. *See*

*Treichler*, 775 F.3d at 1101.  In particular, as discussed above, further proceedings are

warranted for the ALJ to reconsider the step three analysis regarding Listing 5.02; the step

four evaluation of Dr. Crampton's opinion; and the step four evaluation of Plaintiff's physical

and mental impairment testimony.  The Court summarizes below the specific sub-issues to be

addressed by the ALJ on remand.

**Step Three**

On remand, the ALJ shall further develop the record regarding the quantity of blood

transfused in 2020, and on February 26, 2022, and March 19, 2022.  Additionally, the ALJ is

required to consider whether Plaintiff's 2020 and/or 2022 transfusions meet and/or equal

Listing 5.02, and to support her findings with a legally sufficient discussion of the medical

evidence.  In addressing Plaintiff's Listing 5.02 equivalency arguments, the ALJ is directed to

develop the medical record further as warranted, including, but not limited to, consulting an

ME.  If, on remand, the ALJ chooses not to consult an ME regarding Plaintiff's equivalence

with Listing 5.02, the ALJ should explain why she believes that the evidence does not

reasonably support a finding that Plaintiff's 2020 and/or 2022 gastrointestinal hemorrhaging

medically equals Listing 5.02.

**Step Four**

***Medical Opinion Evidence***

On remand, the ALJ should appropriately develop the record as warranted, and should

consider the necessity of an ME or CE in readjudicating the issues related to Plaintiff's mental

impairments, including the evaluation of Dr. Crampton's opinion.  Additionally, in

reevaluating Dr. Crampton's opinion on remand, the ALJ must:

(1)     consider the entire relevant periods for both Plaintiff's DIB and SSI claims in evaluating the consistency and supportability of Dr. Crampton's opinion;

(2)     articulate sufficient reasons supported by citations to specific record evidence with respect to both consistency and supportability factors;

(3)      consider whether Plaintiff's medication noncompliance was caused by her mental illness itself; and

(4)     consider whether DAA analysis is warranted and/or required to the extent the ALJ relies on Plaintiff's benzodiazepine dependence in rejecting medical opinion evidence.

### *Plaintiff's Testimony*

In reconsidering Plaintiff's testimony regarding both her physical and mental impairments, the ALJ should consider the entire relevant SSI and DIB periods, and should link any rejected testimony to the particular parts of the record supporting any adverse credibility determination.

### CONCLUSION

For the reasons set forth above, the Commissioner's final decision is **REVERSED** and this case is **REMANDED** for further administrative proceedings under sentence four of 42 U.S.C. § 405(g).  On remand, the ALJ shall develop the record as necessary, and, as set forth above, reevaluate the step three analysis, the medical opinion evidence, Plaintiff's testimony, and reassess Plaintiff's RFC and the step five findings as warranted by the other findings on

/ / /

/ / /

/ / /

1  remand.

2       Dated this 3rd day of July, 2024.

3

4                                        S. KATE VAUGHAN
                                         United States Magistrate Judge
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

ORDER REVERSING THE
COMMISSIONER'S DECISION - 43